**NEW HORIZON OF NY LLC, Plaintiff—Appellee,**

**v.**

**Robert JACOBS; Elliot Jacobs; Allan Mirwis; E.J. Servicing, Incorporated; E.J. Realty Management Corporation; E.J. Property Consultants; David Queller; David Queller, Incorporated; Ira Born, Defendants–Appellants,**

**and**

**Alan Jacobs[1]; Stanley Lane, M.D.; Peter Dapuzzo; Constance Rosen, Executrix of the Estate of Howard Rosen, M.D.[2]; Ruth Scharf, Defendants.**

**New Horizon of NY LLC, Plaintiff–Appellee,**

**v.**

**Stanley Lane, M.D.; Peter Dapuzzo; Constance Rosen, Executrix of the Estate of Howard Rosen, M.D.; Ruth Scharf, Defendants–Appellants,**

**and**

**Robert Jacobs; Elliot Jacobs; Allan Mirwis; E.J. Servicing, Incorporated; E.J. Realty Management Corporation; E.J. Property Consultants; David Queller; David Queller, Incorporated; Ira Born; Alan Jacobs, Defendants.**

**Nos. 99–1990, 99–1996.**

United States Court of Appeals, Fourth Circuit.

Argued: June 6, 2000

Decided: Nov. 2, 2000

1. Alan Jacobs was dismissed following trial and is not a party to this appeal.

2. Dr. Rosen died during the pendency of the appeal and his personal representative has been substituted as a party.

**ARGUED:** Nathan Lewin, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, D.C.; James G. Exum, Jr., Smith,

Helms, Mulliss & Moore, L.L.P., Raleigh, North Carolina, for Appellants. Charles Robert Holton, Moore & Van Allen, P.L.L.C., Durham, North Carolina, for Appellee. **ON BRIEF:** Paul F. Enzinna, Mark A. Miller, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, D.C.; Matthew W. Sawchak, Paul K. Sun, Jr., Julia F. Youngman, Allison K. Overbay, Smith, Helms, Mulliss & Moore, L.L.P., Raleigh, North Carolina; Robert O. Jenkins, Phillip R. Miller, III, Blanchard, Jenkins & Miller, P.A., Raleigh, North Carolina, for Appellants. Laura B. Luger, Pamela A. Wachter, Moore & Van Allen, P.L.L.C., Durham, North Carolina, for Appellee.

Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.

Vacated and remanded with instructions by published opinion. Judge WIDENER wrote the opinion, in which Judge MICHAEL and Judge DIANA GRIBBON MOTZ joined.

**OPINION**

WIDENER, Circuit Judge:

New Horizon of New York, L.L.C. (New Horizon) filed a six count complaint against fourteen defendants[1] in the United States District Court for the Eastern District of North Carolina. In its complaint, New Horizon alleged under state law that the defendants engaged in tortious interference of contractual relations, unfair and deceptive trade practices, breach of contract, malicious prosecution, and abuse of process; and, under federal law, civil contempt of court. On November 25, 1998, a jury found in favor of New Horizon on its state law claims and awarded New Horizon damages in excess of six million dollars. The district court conducted a bench trial on the civil contempt of court claim and on New Horizon's requests for trebled damages for the unfair and deceptive trade practice count, sanctions against the defendants, and attorneys' fees. On July 19, 1999, the district court denied New Horizon's request for relief on its civil contempt claim and denied the various motions for sanctions. The district court also denied the Jacobs Group defendants' and the Independent Limited Partners defendants' motions for judgment as a matter of law and for a new trial. The district court entered final judgment on July 26, 1999. The defendants appeal from that order. We vacate the judgment of the district court and remand the case to the district court to dismiss the action without prejudice for want of jurisdiction.

I.

The facts of this case involve two somewhat complex bankruptcy cases commenced in the Eastern District of North Carolina: *In re Tudor Associates, Ltd. II*, No. 77-BK-06-04, and *In re AJ & AJ Servicing, Inc.*, No. 94-00135-8-JRL.[2] The Tudor bankruptcy began in 1977, and the AJ bankruptcy began in 1994. We recite only those facts pertinent to the instant controversy and relevant to this disposition.

The defendants in this case are the Jacobs Group and the Independent Limited Partners. The Jacobs Group consists of: Robert Jacobs and Elliot Jacobs, two of the owners of AJ & AJ Servicing Corporation (AJ); Allan Mirwis, who had been a general partner in New British Woods Associates (New British) and New Yorktown Associates (New Yorktown) and later became a limited partner of those partner-

1. The defendants participating in the appeal are divided into two groups. Defendants Robert Jacobs, Elliot Jacobs, Allan Mirwis, E.J. Servicing, Inc., E.J. Realty Management Corp., E.J. Property Consultants, David Queller, David Queller, Inc., and Ira Born will be referred to as the Jacobs Group defendants. Defendants Drs. Stanley Lane and Howard Rosen, Peter Dapuzzo and Ruth Scharf will be referred to as the Independent Limited Partners defendants.

2. The two bankruptcy cases will be referred to as the Tudor bankruptcy and the AJ bankruptcy throughout this opinion.

ships; E.J. Servicing, Inc., E.J. Realty Management, Inc. and E.J. Property Consultants (collectively, the E.J. companies), controlled by Robert Jacobs and Elliot Jacobs; Ira Born, a limited partner in New British and New Yorktown; David Queller; and David Queller, Inc. The Independent Limited Partners are Dr. Lane, a cancer surgeon; Dr. Rosen, an orthopedist; Peter Dapuzzo, a managing director of a brokerage firm; and Ruth Scharf, a retired businesswoman; all of whom were limited partners in the two limited partnerships, New British and New Yorktown. New British and New Yorktown also consisted of 15 other limited partners associated with Sam Sonnenschine (the Sonnenschine Group). New British and New Yorktown owned income producing properties in Durham, North Carolina encumbered by what are called wraparound promissory notes and deeds of trust (wrap notes).[3] The Independent Limited Partners invested in New British and New Yorktown to receive tax benefits.[4] The underlying problem in this case involves the wrap notes and an option to purchase those wrap notes.

Tudor filed its petition for Chapter 12 bankruptcy in 1977. In the course of the Tudor bankruptcy, AJ, the servicer of the wrap notes, acquired one half of the cash net flow from the wrap notes.[5] At the time it acquired the wrap notes, AJ had not filed its petition in bankruptcy. By 1988, Tudor owned the other half of the interest in the wrap notes after various transactions. In 1993, Tudor and the owners[6] of the income producing properties won separate judgments in excess of ten million dollars against AJ, Robert Jacobs, and Elliot Jacobs based on AJ's fraud and mismanagement in the servicing of the wrap notes. Following the entry of those judgments against it, AJ filed for Chapter 11 bankruptcy protection. Both the Tudor bankruptcy and the AJ bankruptcy were pending before the same bankruptcy judge in the Eastern District of North Carolina.

In September 1996, after three years of negotiations, all of the interested parties in the AJ bankruptcy entered into a global settlement (the Confirmation Plan). The compromise addressed the interests of AJ, Robert Jacobs, Elliot Jacobs, the E.J. companies, the Sonnenschine Group, Tudor, Allan Mirwis, Tenzer Greenblatt, LLP (Tenzer), New British, and New Yorktown. Tenzer had a claim against AJ for one and a half million dollars arising out of the lawsuits against AJ for fraud and mismanagement. According to one of the terms in the AJ Confirmation Plan, Tenzer agreed to take $700,000 in settlement (the Settlement Amount) of its claim against AJ. The Settlement Amount was to be paid to Tenzer out of funds provided from the proceeds of refinancing the properties or sale of the wrap notes. Under the Confirmation Plan, AJ would assign its one-half interest in the wrap notes to Tudor in exchange for Tudor's and its general and limited partners' release of all suits, causes of action, debts, sums of money, or demands against AJ and the Jacobs Group.[7] The Confirmation Plan required Tudor to "make a good-faith effort" to effectuate the

3. The mortgages were called "wrap note" mortgages because they required payments to be made to a lender who, in turn, paid the holder of the first mortgage. The "last lender wraps around the original debt," according to one of the bankruptcy Trustees.

4. According to the Independent Limited Partners, if the wrap notes were paid off or foreclosed upon, or if they matured as scheduled, the Independent Limited Partners would suffer recapture of the original tax advantage, which is not otherwise explained.

5. Prior to the confirmation of AJ's plan in bankruptcy, the Jacobs Group defendants controlled AJ.

6. The Limited Partners defendants were limited partners in New British Woods and New Yorktown, along with other limited partners who are not defendants in this present case.

7. Tudor had obtained a judgment against AJ and the Jacobs Group for more than $9.7 million. By assigning its interest in the wrap notes, AJ satisfied Tudor's claim against it and the Jacobs Group.

refinancing of the wrap notes by the end of 1996. The part of the Confirmation Plan that eventually led to the instant controversy was the provision which stated:

> Tudor shall grant to the Sonnenschine Group an option to purchase the wrap notes in accordance with the terms and conditions as set forth in the Settlement Terms Letters attached hereto as *Exhibit C* and *Exhibit D*, and all such terms and conditions are incorporated herein.[8]

Exhibit C stated that the option could be granted to the designee of Sonnenschine; that upon exercise, the option shall transfer all right and title in the properties on or before December 15, 1996; that the Sonnenschine Group would deposit $250,000 with the Tudor Trustee in escrow within ten days after Judge Leonard signed the confirmation; that the closing date could be initially extended to January 1997 by the Tudor Trustee, and if not so extended the option would expire on December 15, 1997; and that the option may be extended to March 31, 1997 upon release of the $250,000 deposit and upon payment of one million dollars by Sonnenschine or its designee. New Horizon was named as the designee for the Sonnenschine Group.

The Confirmation Plan was "unanimously accepted by all voting creditors and equity security holders of [AJ], including all general unsecured creditors, the Partnerships, by and through their general partner, together with the assent and acquiescence of the Sonnenschine Group, Tudor Associates . . ., and the equity security holders." No other parties came forth at that hearing to reject the Confirmation Plan; however, Gerald Cohen, the attorney for certain of the Independent Limited Partners, did not attend the confirmation hearing. These limited partners were deemed to have accepted the Confirmation Plan via the general partner's acceptance of it. The bankruptcy court confirmed the Confirmation Plan on September 26, 1996.

On October 7, 1996, Cohen filed a notice of appeal of the September 26, 1996 AJ Confirmation Plan, alleging that the approved payment of funds to Tenzer could have been available for distribution to the Independent Limited Partners. He voluntarily withdrew that appeal on October 18, 1996. By the end of October 1996, the judgments against AJ and the Jacobs Group were vacated in accordance with the Confirmation Plan.

Also on October 7, 1996, New Horizon sent a letter to the Tudor Trustee informing him that the required $250,000 deposit was being held in an escrow account opened by New Horizon's attorney and could be transferred to the Tudor Trustee when the option agreement was made final. Whether the Tudor Trustee had previously consented to leaving the deposit money in New Horizon's attorney's account is not shown. New Horizon proceeded to negotiate for financing in order to exercise the option according to the Confirmation Plan's terms. The Tudor Trustee and New Horizon continued to work out the specific terms of the option agreement and reached an agreement, after which the Tudor Trustee sought approval from the bankruptcy court in the Tudor bankruptcy.[9] On November 19, 1996, Cohen wrote a letter to the bankruptcy court objecting to the option agreement terms. The bankruptcy court did not consider this letter during the Novem-

8. Apparently, this term of the Confirmation Plan was added because Tenzer threatened to proceed against New British and New Yorktown with an involuntary bankruptcy proceeding in New York because AJ owed Tenzer money for legal fees.

9. The option agreement stated that if the option was exercised in accordance with the agreement's terms, the purchase price shall be the sum of: 1) the net $12,250,000 paid to Tudor, 2) payment of all sums necessary at closing to satisfy all existing liens senior to the mortgages, and 3) payment of $1,000,000 to the partnerships designated for payment to their law firms (Tenzer) as set forth in the AJ Confirmation Plan.

ber 26, 1996 hearing on the approval of the option agreement because Cohen had sent the letter C.O.D., the bankruptcy court clerk refused to pay the charge, and Cohen did not attend the approval hearing. After the hearing, the bankruptcy court approved the option agreement in its entirety and found that it conformed with the Confirmation Plan.[10] On December 6, 1996, Cohen, on behalf of the Independent Limited Partners, filed another notice of appeal in the bankruptcy court contesting the November 26, 1996 order approving the option agreement between the Tudor Trustee and New Horizon. In a letter to the Independent Limited Partners, Cohen wrote that Sonnenschine had a troublesome record and that any money Sonnenschine paid to extend the option would be money that could have been distributed to the Independent Limited Partners.

The terms of the option agreement imposed time constraints on New Horizon to exercise the option and close the purchase. On December 11, 1996, New Horizon paid the deposit, which had been with its attorney (perhaps in escrow), converting the option into a contract of sale. New Horizon could not, however, obtain financing for the purchase price of the wrap notes by the stipulated closing date. The Tudor Trustee extended the closing date at New Horizon's request to January 15, 1997, but informed New Horizon that to extend the date further, New Horizon would have to pay an additional one million dollar deposit by December 20, 1996. New Horizon did not make the additional deposit. On January 16, 1997, the district court dismissed the appeal filed by Cohen because the Independent Limited Partners did not designate items to be included on appeal or provide a statement of the issues to be presented within 10 days of filing its notice of appeal. The Independent Limited Partners had moved for an enlargement of time to designate the issues of appeal; however, the Tudor Trustee countered that motion by claiming that great prejudice would ensue to the Tudor estate by holding up the sale of the wrap notes.[11]

On January 14, 1997, New Horizon made a motion for enlargement of time to exercise the option and for other relief (motion for enlargement) instead of paying the additional one million dollar deposit to Tudor to extend the option until March 1997 as provided in the option agreement and the Confirmation Plan. In its motion for enlargement, New Horizon objected to the December 6, 1996 appeal filed by Cohen. New Horizon contended that: 1) Cohen's clients, the Independent Limited Partners, as well as the Jacobs Group, had no standing to file the December 6, 1996 appeal; 2) Cohen filed the appeal in bad faith, for purposes of harassment or delay, and with intentional and willful disregard of the September 26, 1996 AJ Confirmation Plan; 3) the appeal tortiously interfered with the contractual rights of New Horizon and denied the full consummation of the AJ Confirmation Plan; and 4) even if the appeal was dismissed, a threat of on-going litigation harmed New Horizon and the AJ Confirmation Plan. Along with the motion for enlargement, New Horizon moved for an order to show cause as to why certain parties, including these defendants, should not be held in contempt of court and for injunctive relief (motion to show cause). In its motion to show cause, New Horizon alleged that the Independent Limited Partners and the Jacobs Group had violat-

10. The general partner of New British Woods and New Yorktown agreed to the option agreement. Cohen represented seven limited partners of New British Woods and New Yorktown.

11. A December 30, 1996 filing indicated that the Independent Limited Partners objected to the option agreement because they alleged that it was materially different from the terms in the Confirmation Plan and that Sonnenschine had forfeited the rights to the option by not complying with the option terms. This was a similar position to that taken earlier by Mirwis at the hearing on approval of the option agreement. We express no opinion on the effectiveness of these matters as a defense to the claim of contempt of court for taking a bad faith appeal.

ed the Confirmation Plan in civil contempt of the bankruptcy court's orders.

On February 3, 1997, the bankruptcy court held a hearing on New Horizon's motions. At the hearing, Judge Leonard stated that the option had expired and that the Tudor Trustee was free to deal with whomever he chose to find another buyer for the wrap notes. On February 6, 1997, the bankruptcy court entered its orders denying New Horizon its requested relief. New Horizon *did not* appeal these bankruptcy court orders to the district court.

Instead of appealing the bankruptcy court's orders, on February 25, 1997, New Horizon filed the complaint in the case at hand in the district court commencing this civil action. In its complaint, New Horizon sought compensatory and punitive damages and requested a jury trial.[12] New Horizon based its lawsuit on the contention that the defendants were bound by the Confirmation Plan and received benefits from it; however, the defendants "engaged in a conspiracy to thwart consummation" of the option agreement by filing appeals and objections in the Tudor bankruptcy and by making contacts with the lender from whom New Horizon sought financing for the wrap notes sale and the general partner of New British and New Yorktown, all in an attempt to make the option fail.

On June 20, 1997, the district court entered an order in this case finding that the "substance of this matter is related to cases having arisen under Title 11" and referred it to the bankruptcy court. The bankruptcy court heard and determined an abundance of motions between June 1997 and October 1998.[13] After the bankruptcy court denied both parties' motions for summary judgment on October 22, 1998, the district court set a trial date. On November 3, 1998, the trial began in the district court.[14] The parties presented evidence to the jury on all of New Horizon's claims except the civil contempt of court claim. The district judge determined that he would decide the contempt matter and hear the testimony relating to it during the jury's deliberations. The jury returned its verdict in favor of New Horizon on November 25, 1998. The district court entered its order regarding the contempt matter and other post trial motions on July 19, 1999.[15] The Jacobs Group defendants and the Independent Limited Partners defendants appeal the final judgment entered on July 19, 1999 and amended on July 26, 1999. New Horizon did not ap-

12. On February 20, 1998, New Horizon amended its complaint and added two more state law claims—tortious abuse of process and malicious prosecution.

13. On August 5, 1997, Judge Leonard determined that his previous order of February 6, 1997 was not an adjudication of the contempt issue as against the defendants in this action. In fact the order of February 6, 1997 was brief and to the point. It described the matter as a "Motion to show cause [why a contempt action should not follow] and for injunctive relief." The action taken by the bankruptcy court was "this motion is denied." See footnote 20, *infra.*

14. On October 23, 1998, the Jacobs Group defendants filed a motion to dismiss the entire action for lack of subject matter jurisdiction. Later, New Horizon filed a response in opposition to this motion and made a motion for sanctions against the Jacobs Group defendants for filing their motion.

15. The district court denied New Horizon's claim for civil contempt; motions for sanctions against the Jacobs Group defendants for filing a motion to dismiss for lack of subject matter jurisdiction; motions to strike and for sanctions against the Jacobs Group defendants relating to the defendants' late filing of two motions in limine; renewed motion for summary judgment; amended trial memorandum and proposed jury instructions; motions for sanctions regarding the failure of certain defendants to respond to interrogatories and requests for production of net worth; and motion for fees and costs relating to the supplemental proffer. The court also denied defendants' motion for judgment as a matter of law. The court granted New Horizon's motion for sanctions against the Jacobs Group for failure to respond to certain discovery requests and allowed attorneys' fees related to those sanctions.

peal the denial of its civil contempt of court claim.

II.

While there are various issues raised on appeal, we must first consider the defendants' contention that the district court lacked subject matter jurisdiction over this case. Lack of subject matter jurisdiction may be raised at any time by the parties or the court. See *Insurance Corp. of Ireland v. Compagnie des Bauxites,* 456 U.S. 694, 701–02, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *United States v. White,* 139 F.3d 998, 999–1000 (4th Cir. 1998). The district court determined that this case was related to cases arising under title 11. We review its determination of subject matter jurisdiction *de novo.* See *Folio v. City of Clarksburg,* 134 F.3d 1211, 1214 (4th Cir.1998).

To repeat, on February 6, 1997, before the case before us was filed, the bankruptcy court entered two orders in response to New Horizon's motion for enlargement of time and its motion to show cause. After a hearing and argument from New Horizon, the Tudor Trustee and the Independent Limited Partners, the bankruptcy court denied both of New Horizon's motions and entered its orders. New Horizon did not appeal these two adverse rulings to the district court, rather, it waited until after the time for filing an appeal had expired and then chose to file this entirely separate civil action against the Jacobs Group and the Independent Limited Partners based on the same factual scenario, but requesting money damages rather than injunctive relief.

In its complaint in the present case filed on February 25, 1997, New Horizon alleged jurisdiction under 28 U.S.C. § 1334 because it believed that this case was related to proceedings under title 28 of the United States Code. Section 1334(b) provides:

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). When Congress enacted § 1334, it "was concerned with the inefficiencies of piecemeal adjudication of matters affecting the administration of bankruptcies and intended to give federal courts the power to adjudicate all matters having *an effect* on the bankruptcy." *In re Wood,* 825 F.2d 90, 92 (5th Cir.1987) (citing S. Rep. No. 989, 95th Cong., 2d Sess., 153–54 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5939–40) (emphasis added).

New Horizon sought to invoke federal jurisdiction over claims it alleged were related to the AJ bankruptcy or the Tudor bankruptcy, either or both. *Related to* jurisdiction, however, has a special meaning in the law,[16] and we must turn to the test approved by the Supreme Court in *Celotex Corp. v. Edwards,* 514 U.S. 300, 307–08, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), in determining whether the district court had subject matter jurisdiction in this case.[17] As the Court stated in *Celotex,* the " 'related to' language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simply proceedings involving the property of the debtor or the estate;" however, " 'related to' jurisdiction cannot be limitless." *Celotex,* 514 U.S. at 308, 115 S.Ct. 1493 (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984))

16. Related to jurisdiction does not mean that the case is related in the ordinary sense of the word "related." Webster's defines "related" as "connected or associated." *Webster's II New Riverside University Dictionary* 992 (1988).

17. Other federal question jurisdiction or diversity of citizenship is not claimed in this case.

(internal quotations omitted), and *Board of Governors, FRS v. MCorp Financial Inc.*, 502 U.S. 32, 40, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991) (Congress has vested limited authority in bankruptcy courts). See also *In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir.1996); *In re Wood*, 825 F.2d at 93 (stating that "the definition of [related to jurisdiction] of the Court of Appeals for the Third Circuit [*Pacor* ] appears to have the most support"). A civil case filed in a district court is related to a case in bankruptcy if the outcome in the civil case "*could conceivably have any effect on the estate being administered in bankruptcy* ... if the out-come could alter the debtor's rights, liabilities, options, or freedom of action (positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Celotex*, 514 U.S. at 308, n. 6, 115 S.Ct. 1493 (quoting *Pacor*, 743 F.2d at 994) (internal quotations omitted) (italics in *Pacor* ).

This court has adopted the *Pacor* related to test and has held that a district court, "and derivatively the Bankruptcy court" has jurisdiction over an action related to a bankruptcy case "if the outcome [of the proceeding] could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and [the proceeding] in any way impacts upon the handling and administration of the bankrupt estate." *Spartan Mills v. Bank of Am. Ill.*, 112 F.3d 1251, 1255–56 (4th Cir.), *cert. denied*, 522 U.S. 969, 118 S.Ct. 417, 139 L.Ed.2d 319 (1997) (quoting *Pacor*, 743 F.2d at 994 (internal quotation marks omitted)). The Supreme Court gave the following as an example of a civil case related to a bankruptcy case: "suits between third parties which have an effect on the bankruptcy estate." *Celotex*, 514 U.S. at 307 n. 5, 115 S.Ct. 1493 (citing 1 *Collier on Bankruptcy* ¶ 3.01[1][c][iv] at 3–28 (15th ed.1994)). Notably, as is the case here, a related to case need not necessarily be against the debtor or his property. Nevertheless, the "mere fact that there may be common issues of fact between a civil proceeding and a controversy involving a bankruptcy estate does not bring the matter within the scope of [1334(b)]." *Pacor*, 743 F.2d at 994.[18] In this circuit, a civil case is related to bankruptcy if "the outcome of[the civil] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Celotex Corp.*, 124 F.3d 619, 625 (4th Cir. 1997) (citing *Pacor*, 743 F.2d at 994),[19] see also *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002 n. 11 (4th Cir.1986).

A.

■ New Horizon argues that the case at hand is related to other cases under title 11, and the district court referred the case to the bankruptcy court on those grounds. It argues that its civil contempt claim saves the day jurisdiction-wise: "[New] Horizon's contention below that the Defendants acted in contempt of the Confirmation Order." Thus, New Horizon rests all of its claims asserted here on the jurisdictional basis of the civil contempt of court claim. New Horizon asserts that "[t]he very integrity of the orders of a federal court is at issue here" because the contempt claim involves the alleged behavior of the defendants in contempt of the bankruptcy court's order confirming the AJ plan. According to New Horizon, if the district court had ruled in its favor on the contempt issue, "one of the conceivable remedies the court might have granted was to undo part or all of the [AJ] Confirmation Plan."

18. The *Pacor* test has been adopted by the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits and the Supreme Court cited it with approval in *Celotex*. See *Dow Corning*, 86 F.3d at 489 (listing the circuits). See also *Celotex*, 514 U.S. at 308 n. 6, 115 S.Ct. 1493.

19. *Celotex* in the Fourth Circuit is a different case than the Supreme Court's *Celotex* referred to throughout this opinion.

The argument goes that the contempt claim and the relief that could have been accorded to New Horizon on that claim would have had an effect on the estate being administered in bankruptcy. This potential effect on the bankruptcy estate, it continues, would then give the district court related to jurisdiction.

It is true that the integrity of the orders of a federal court are at issue here, but the record requires a result opposite to that advocated by New Horizon.

The problem with the reasoning of New Horizon is that it ignores the fact that the order of the bankruptcy court of February 6, 1997 was a final order because it was not appealed from on or before 10 days thereafter pursuant to 28 U.S.C. § 158(a) and § 158(c) and Rule 8002 of the Bankruptcy Rules. See also Bankruptcy Rule 9020 and *In re Walters,* 868 F.2d 665 (4th Cir.1989). Thus, the claim in the complaint in this case that jurisdiction is established under 28 U.S.C. § 1334(b) as a related to case under Title 11 because of its claim that the defendants were guilty of civil contempt of the Bankruptcy Court depends for its success on a collateral attack on a final order of the bankruptcy court, which two opinions of the United States Supreme Court, *Celotex Corp. v. Edwards,* 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), and *Oriel v. Russell,* 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929), have decided is not permissible. We are of opinion that the jurisdictional base for this case should not be permitted to stand on a collateral attack which has been forbidden by two decisions of the Supreme Court.

The hearing on February 3, 1997 was the result of a motion filed in the Bankruptcy Court and dated January 14, 1997, seeking to hold the defendants in the present case:

> in civil or criminal contempt of prior orders of ... [the bankruptcy court].

The "prior orders" of the bankruptcy court refer to the order of confirmation of the AJ plan with its associated terms, and the January 14th motion also asked for injunctive relief. On February 3, 1997, the court heard the motion for contempt and on February 6, 1997 entered the following order:

> This confirmed Chapter 11 case is before the court on a motion to show cause [why the defendants should not be cited for contempt] and for injunctive relief filed by New Horizon of NY, L.L.C. A hearing was held on February 3, 1997 in Raleigh, NC. For the reasons stated in open court, this motion is denied.
>
> So Ordered.

Although all of the parties were present in that proceeding so that the bankruptcy court could have given complete relief, such relief was denied and New Horizon *did not* appeal the denial of relief. Rather, it let the time for appealing expire and on February 25, 1997, some 19 days later, it filed its complaint in the case at hand. In that complaint was Count 3 "Civil Contempt of Court," the pertinent part of which is quoted in full as follows:

> The actions of each and every defendant, as described hereinabove, constitutes contempt of the United States Bankruptcy Court through the knowing, willful, and contumacious violation of the order of the Honorable J. Rich Leonard dated September 26, 1996 confirming AJ and AJ's plan of reorganization and the terms of the settlement.

Thus, it is patent that the civil contempt count, on which New Horizon bases its claim in this case of related to jurisdiction under § 1334, is nothing more nor less than a collateral attack on the order of the bankruptcy court of February 6, 1997. "Courts must speak by orders and judgments, not by opinions, whether written or oral, or by chance observations or expressed intentions made by courts during, before or after trial, or during argument." *Murdaugh Volkswagen v. First National*

*Bank of SC,* 741 F.2d 41, 44 (4th Cir. 1984).[20]

In *Celotex Corp.,* 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403, the bankruptcy court for the Middle District of Florida issued an injunction prohibiting judgment creditors from executing on a supersedeas bond without the bankruptcy court's permission. Edwards was a judgment creditor and, despite the order of the bankruptcy court enjoining the collection of the supersedeas bond, a Texas district court permitted Edwards to proceed on the bond, although the bankruptcy court's injunction had not been modified. The holding of the district court was that the earlier injunction of the bankruptcy court was erroneous although it had not been modified or reversed. That decision was affirmed by the Fifth Circuit, but the Supreme Court reversed, holding that "it is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." 514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403. The Court further stated that the judgment creditor

> [i]f dissatisfied with the Bankruptcy Court's ultimate decision, ... [could] appeal "to the district court for the judicial district in which the bankruptcy judge is serving," see 28 U.S.C. § 158(a), and then to the Court of Appeals for the Eleventh Circuit, see § 158(d). *Respondents chose not to pursue this course of action, but instead chose to collaterally attack the Bankruptcy Court's Section 105 Injunction in the federal courts in Texas. This they cannot be permitted to do without seriously undercutting the orderly process of the law.* (Italics added).

514 U.S. 300, 313, 115 S.Ct. 1493. The *Celotex* Court relied on and followed its decision in *Oriel v. Russell,* 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929). That case, like the one at hand, concerned contempt citations. Contempt orders for violations of turnover orders had been entered by the district court and affirmed by the court of appeals following decision by the referee in bankruptcy to turn over the books and property in question from which no appeals were taken. On a motion to commit the bankrupts to jail, one attempted to introduce evidence on the issue of whether or not at the time of the turnover order he had the books in question in his possession or under his control, and the other attempted to show omitted evidence in the turnover proceeding. Both the referee and the district court refused to retry those issues on the ground that the turnover orders should not be collaterally attacked. The Court affirmed the court of appeals and stated that the orders of contempt are entered by a bankruptcy court with "... the understanding that it is rendering a judgment which is only to be set aside on appeal or some other form of review, or upon a properly supported petition for rehearing in the same court." 278 U.S. 358, 364, 49 S.Ct. 173, 73 L.Ed. 419.

Our circuit followed the holdings in *Celotex* and *Oriel* in *Spartan Mills v. Bank of*

20. On August 5, 1997, some six months later and more than five months after the filing of the case at hand, Judge Leonard referred to his February 6, 1997 order: "In this situation, the court has the luxury of hindsight. The primary issue at the [February] hearing was whether the court should grant the injunctive relief requested. The court denied this request, finding that the alleged misconduct was simply irrelevant to [New Horizon's] entitlement to the relief then sought. Having denied the injunctive relief, the court never considered the allegations underlying the contempt motion and did not adjudicate it. It follows that the court's February 6, 1997 order is not res judicata as to the present action."

The luxury of hindsight, however, is not a luxury afforded to a United States District Court, and thus not to a bankruptcy court. *Lewis v. Tobacco Workers Int'l Union,* 577 F.2d 1135, 1139 (4th Cir.1978) (holding that an order appealed from may not be changed during a pending appeal). Thus the final order here was not subject to change.

*America Illinois,* 112 F.3d 1251 (4th Cir. 1997). In that case, a Florida bankruptcy court had ordered the sale of property in the possession of the bankrupt notwithstanding the fact that there were conflicting liens claimed against the property and the order of sale of the property provided that the liens would be preserved against the fund. A later order of the bankruptcy court approved the sale of the property and established finally the order of liens against the fund. This order was not appealed from although Spartan Mills was a party to that proceeding. Later, Spartan Mills filed an action in the district court seeking a declaratory judgment that its lien was superior to the liens established by the bankruptcy court. The district court declined to grant relief because it held that "Spartan's action constitutes an improper collateral attack on the sale order issued by the United States Bankruptcy Court." 112 F.3d at 1254. We affirmed, relying on *Celotex* and *Oriel.* We reasoned that "a challenge for error may be directed to the ordering court or a higher court, as rules provide, but it may not be made collaterally unless it is based on the original court's lack of jurisdiction." 112 F.3d at 1255. In accord is *Lindsey v. Ipock,* 732 F.2d 619, 622 (8th Cir.1984), holding that a lien claimant might not collaterally attack a bankruptcy court's order of sale in "collateral proceedings."

*Celotex* and *Oriel* have not been overruled, watered down, or questioned, by the Supreme Court, and our circuit precedent is entirely in accord with those cases. Thus, we conclude that the related to jurisdiction claimed by New Horizon is not to be supported by a collateral attack on an order of the bankruptcy court, which attack is quite contrary to Supreme Court and our own circuit precedent.

B.

We now examine whether New Horizon's other claims made in their complaint under state law are related to a bankruptcy case so as to provide subject matter jurisdiction under § 1334(b). During oral argument, counsel for New Horizon conceded that "this case is based on an [allegedly] frivolous or bad faith appeal from an order of the bankruptcy court as a matter of state law."

In consideration of this question, we are reminded that the standard for related to jurisdiction under § 1334 is from *Pacor,* 743 F.2d 984, as set out in *Celotex,* 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403, as follows:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy [under § 1334] is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* ... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

(Emphasis in original).

The defendants argue that the state law claims brought by New Horizon, tortious interference with a contract, breach of contract, malicious prosecution, abuse of process, and unfair and deceptive trade practices, do not alter AJ's or Tudor's rights or liabilities or impact the handling or administration of the AJ bankruptcy or the Tudor bankruptcy.

The following facts are uncontradicted: New Horizon is not a debtor or a creditor in either the AJ or Tudor bankruptcy, rather it is an entity created for the purpose of acquiring, post-confirmation, an interest in an asset; neither the AJ nor the Tudor bankrupt estate is a party to this action; the defendants are not debtors in either bankruptcy nor are they bankruptcy creditors; and New Horizon is not seeking to have the court enforce or implement any order touching upon a bankrupt estate.

In its complaint, New Horizon requested that the district court award compensatory

and punitive damages against these defendants as relief for its claims rather than relief regarding the Confirmation Plan, the expired option, or the wrap notes. The bankruptcy court made its final order on February 6, 1997 regarding the Tudor Trustee's right and ability to sell the wrap notes to whomsoever the Trustee chose. *New Horizon's option to buy the wrap notes was deemed to be expired and was not revived, and New Horizon also failed to appeal that judgment.* Instead, New Horizon now prays for damages, all of which are against these defendants and are completely unrelated to the sale of the wrap notes or the administration of the bankruptcy estates. Any damages paid by the Jacobs Group defendants or the Independent Limited Partners defendants would come out-of-pocket from those defendants, none of whom were debtors or creditors in either bankruptcy and would have no effect on either bankrupt estate. Any recovery would not inure a benefit to the AJ bankrupt estate or the Tudor bankrupt estate, and an order or judgment in this case would not modify or affect either estate. In fact, the wrap notes were sold to another purchaser in September 1997, pursuant to the bankruptcy court's unappealed order, for a higher purchase price,[21] and the AJ estate was settled months before, and unaffected by the trial in this case. Based on the facts we have mentioned, we find that the resolution of the claims in the case at hand could have no conceivable effect on the AJ and Tudor bankruptcy estates, and therefore, this case is not related to the AJ bankruptcy case nor the Tudor bankruptcy case within the meaning of 28 U.S.C. § 1334.

C.

New Horizon's other arguments in support of related to jurisdiction fail as well. New Horizon asserts that the bankruptcy court retained jurisdiction over the Confirmed Plan with AJ bankruptcy, and therefore, it should have jurisdiction in this case. The plan cannot confer jurisdiction upon a bankruptcy court or a federal district court, see 8 *Collier on Bankruptcy* ¶ 1142.04[1], rather 28 U.S.C. § 1334 governs jurisdiction. And, in all events, nothing about this case, nor the result thereof, has or may have any conceivable effect on either the AJ or Tudor bankrupt estates, nor does it alter the debtors rights, liabilities, options, or freedom of action (either positively or negatively) or in any way impacts upon the handling and administration of either bankrupt estate. *Celotex,* 514 U.S. 300, 308, n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403.

III.

Because resolution of this action for or against these defendants could not affect the bankrupt estates or the debtors in any way pursuant to the *Pacor* rules as adopted by the Court in *Celotex* and by this court in *Robins* and *Spartan Mills* and our own *Celotex,* we hold that the district court did not have related to jurisdiction under 28 U.S.C. § 1334 in this case. We especially note that we express no opinion on the merits of the state law claims asserted in this case.

Accordingly, the judgment of the district court appealed from is vacated and the case is remanded to the district court for dismissal without prejudice for lack of subject matter jurisdiction.

*VACATED AND REMANDED WITH INSTRUCTIONS*

21. If anything, the Tudor estate benefitted from the subsequent sale to another purchaser. But that was not affected by the result in the case at hand.